**IT IS ORDERED as set forth below:**



**Date: September 29, 2023**

_____
*Susan D. Barrett*
United States Bankruptcy Judge
Southern District of Georgia

---

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Dublin Division

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 Case |
| | ) | No. <u>22-30002</u> |
| MATTHEW H. CALLIER, | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

### **OPINION AND ORDER**

The following matters are before the Court: (1) Sarasota CCM, Inc.'s ("Sarasota") Motion to Dismiss Matthew H. Callier's ("Debtor") bankruptcy case pursuant to 11 U.S.C. §707(a)[1] ("Dismissal Motion"); (2) Debtor's Motion to Avoid Sarasota's Judicial Lien ("Lien Avoidance Motion"); and (3) Sarasota's Objection to Debtor's Claim of Exemptions ("Objection to Exemptions").  Dckt. Nos. 30-31 and 37-39 (Dismissal Motion); Dckt. Nos. 11, 14, and 33 (Lien Avoidance Motion); and Dckt. No. 40 (Objection to Exemptions).  In

---

[1]  All statutory references are to Title 11 of the United States Code unless otherwise noted.

addition, this Order also memorializes the oral evidentiary rulings issued at the Pre-Trial Conference.  Dckt. Nos. 71, 73-75, and 82.

These are core proceedings under 28 U.S.C. §157(b)(2)(A), (B), (K), and (O) and the Court has jurisdiction to consider the matters pursuant to 28 U.S.C. §1334.   For the reasons set forth herein, Sarasota's Dismissal Motion is denied; Debtor's Lien Avoidance Motion is granted in part and denied in part; and Sarasota's Objection to Exemptions is denied.

## **FINDINGS OF FACT**

Debtor's father financed the purchase of a tractor trailer for his logging business and Debtor guaranteed this debt ("the Loan").  Dckt. No. 72, Joint Ex. 1; Dckt. No. 96, Tr. 27:9-14, 137:11-25.  Debtor operated a related business but had no legal affiliation with his father's business.  Dckt. No. 96, Tr. 139:7-25, 238:3-14.  Debtor never made any payments on the Loan.  Id., Tr. 238:3-14.  Sometime around 2018, both Debtor and his father's logging industry businesses failed.   Id., Tr. 138:23-139:3, 266:6-10, 306:14; Dckt. No. 99, Tr. 366:15-22, 387:19-20.

The Loan went into default and collection actions were commenced by Sarasota as the current holder of the indebtedness.  Dckt. No. 30; Dckt. No. 72, Joint Ex. 48; Dckt. No. 96, Tr. 25:11-15.  In March 2020, Sarasota's collection counsel, D. Scott Bass ("Bass"), sent a letter ("Collection Letter") to both Debtor and Debtor's father.  Dckt. No. 72, Joint Ex. 1; Dckt. No. 96, Tr. 25:11-23.  Bass testified he left phone messages on Debtor's voicemail after he received no response to the Collection Letter.  Dckt. No. 96, Tr. 28:1-33:6, 64:13-65:9.  Debtor does not recall receiving the Collection Letter or any messages and denies having any communication with Bass.  Id., Tr. 144:24-146:1, 240:11-24; Dckt. No. 72, Joint Ex. 24.

2

**State Court Action.**[2]

Ultimately, Sarasota filed a complaint in state court against Debtor and Debtor's father in June of 2020 ("State Court Action").  Dckt. No. 72, Joint Ex. 2; Dckt. No. 96, Tr. 33:10-24.  The complaint listed the correct service addresses for both Debtor and Debtor's father. Dckt. No. 72, Joint Ex. 2, ¶1-2; Dckt. No. 96, Tr. 146:6-15, 241:9-11.  These are different locations within the rural community of Eastman, Georgia.  Dckt. No. 72, Joint Ex. 2, ¶1-2.

Deputy Mark E. Sheffield ("Sheffield") was the officer assigned to perform the sheriff's entry of service upon the defendants.  Dckt. No. 72, Joint Exs. 3-4; Dckt. No. 96, Tr. 90:19-91:9, 94:16-18.  Sheffield testified he serves thousands of processes each year and does not remember this particular service, but he frequently remembers the addresses he serves process upon, and he remembers Debtor's service address.  Dckt. No. 96, Tr. 94:21-95:8. Furthermore, his practice is to go to the service address and leave a copy of the service form with the named defendant along with the complaint and summons.  Dckt. No. 96, Tr. 86:22-89:8, 94:2-6.  After service is completed, every entry of service is recorded in the civil record ledger located at the sheriff's office along with the service method used.  Id., Tr. 91:23-92:13; Dckt. No. 72, Joint Ex. 4.  Both Debtor and Debtor's father's names appear on the ledger as having been personally served, but Debtor denies having been personally served.  Dckt. No. 72, Joint Exs. 4 and 28; Dckt. No. 96, Tr. 147:12-148:24, 156:4-10.

At trial, Debtor's mother and Sheffield testified to knowing each other.  Dckt. No. 96, Tr. 96:23-24, 303:14-15.   Debtor's mother acknowledged she accepted service on behalf of

---

[2]  The subheadings in the Findings of Fact and Conclusions of Law sections of this Order are for organizational purposes only. The analysis and discussion in each section are not limited to that subheading but are equally applicable throughout without being repeated in each section.

AO 72A
(Rev. 8/82)

her husband at their residence.  Id., Tr. 303:3-20.  She also testified to telling Sheffield she would accept service for Debtor even though Debtor did not reside there.  Id.  She testified that Sheffield served her with both sets of service papers—one for Debtor and one for Debtor's father.  Id.

Debtor's mother says she took the papers to her attorney, Ronald E. Daniels ("Daniels") and asked him to represent Debtor and Debtor's father in the State Court Action. Id., Tr. 304:21-23, 306:18-21.  Daniels testified he has known the Callier family "pretty much [his] entire life" and he accepted the representation.  Id., Tr. 99:21-100:7.  Debtor's mother did not recall whether she told Debtor that he was "being sued."  Id., Tr. 310:3-22.  However, she did tell Debtor "there were things going on with the [tractor trailer]," and that "[Daniels] was checking into some things."  Id.

Debtor's mother testified she was the liaison for the communications between Daniels and her family related to the State Court Action.  Id., Tr. 306:22-23. Daniels confirmed this arrangement.  Id., Tr. 113:16-114:5.  Debtor's father has some health-related memory issues. Id., Tr. 304:6-10.  This also was during the COVID-19 pandemic/shutdown, and the parties acknowledge the litigation process, discovery, mail delivery, and office formalities were somewhat atypical during this period.  Id., Tr. 65:17-25, 73:14-77:17, 124:12-129:12, 130:13-132:9.

Debtor testified that he did not hire Daniels to represent him in the State Court Action nor did he discuss anything related to the litigation with Daniels.  Id., 149:5-11, 153:4-25, 239:14-15; see also Dckt. No. 72 Joint Ex. 24.  Debtor says he was aware of an ongoing dispute with the Loan, but never knew he was actually a named party in the State Court Action. Dckt. No. 96, 154:22-155:14.  He says his mother told him "[his parents] were handling it."

<u>Id.</u>, Tr. 155:18-156:10. Debtor acknowledged his wife sent documents to Daniels but says that was not unusual because she helped keep the books and records for Debtor's father's business and the Loan. <u>Id.</u>, Tr. 157:2-17, 238:15-19.

Ultimately in 2021, Sarasota obtained summary judgment against both Debtor and his father in the amount of $38,434.04 plus 18% interest per annum ("Judgment Amount"). <u>Id.</u>, Tr. 49:17-50:6; Dckt. No. 72, Joint Ex. 13. Thereafter, Sarasota commenced collection actions. Dckt. No. 96, Tr. 50:13-51:25. After locating the tractor trailer and discovering it was inoperable, Sarasota sold it for $5,000.00, which was applied to the outstanding Judgment Amount. <u>Id.</u>, Tr. 51:19-53:19. Then, Sarasota began to garnish Debtor's wages. <u>Id.</u>, Tr. 54:18-55:23; Dckt. No. 72, Joint Ex. 15. Until his wages were garnished, Debtor stated he was unaware that he too had been sued on the Loan. Dckt. No. 96, Tr. 20:12-13, 239:10-13; Dckt. No. 72, Joint Ex. 28.

Debtor's mother unsuccessfully attempted to negotiate a settlement of the Judgment Amount. Dckt. No. 96, Tr. 56:3-58:8, 304:24-305:12; 319:1-19. Debtor never made any effort to settle or repay any portion of this debt. <u>Id.</u>, Tr. 20:12, 58:2-8, 81:25-82:10, 166:22-25.

**<u>Bankruptcy Filing.</u>**

Debtor filed his chapter 7 petition on January 12, 2022, shortly after Sarasota garnished his wages. Dckt. No. 1; Dckt. No. 72, Joint Exs. 15-17. He fully acknowledges that Sarasota's collection actions precipitated the bankruptcy filing. Dckt. No. 96, Tr. 237:19-21.

Debtor's Schedules list two creditors: Sarasota's Judgment Amount and $2,300.00 owed to Home Depot. Dckt. No. 72, Joint Ex. 17, Schs. D and E/F. Debtor's Schedules

AO 72A
(Rev. 8/82)

indicate he has a household of five members, consisting of Debtor, his wife, and three children, ages 11, 14 and 21. Id. at Sch. J. Debtor's 21-year-old son is a college student whom Debtor claimed as a dependent on his bankruptcy Schedules, but acknowledged will no longer be claimed as a dependent for tax purposes. Id.; Dckt. No. 96, Tr. 250:13-23; Dckt. No. 72, Joint Ex. 28B.

Debtor has a high school education and works as a painter for the Department of Defense at Robins Air Force Base. Dckt. No. 72, Joint Ex. 17, Sch I; Dckt. No. 96, Tr. 228:9-10; Dckt. No. 99, Tr. 384:16-17. Debtor's Schedule I indicates Debtor's and his wife's gross monthly income is $5,409.24, and after expenses are deducted, the family's net monthly income is $26.24. Dckt. No. 72, Joint Ex. 17, Sch. I.

Debtor does not own any real property. Dckt. No. 72, Joint Ex. 17, Sch. A/B. He lives with his family in a house owned by his mother-in-law. Dckt. No. 96, Tr. 187:17-25. He maintains the house in lieu of paying rent. Id., Tr. 188:1-5, 255:8-11. Debtor has two vehicles in the household, both of which are almost a decade old. Dckt. No. 72, Joint Ex. 17, Sch. A/B. Debtor owns a 2013 Yukon with more than 200,000 miles that his wife drives; and he drives a 2014 Chevy owned by his mother-in-law with more than 135,000 miles. Id. Debtor makes the $400.00/month payment on the Chevy, even though the loan and title for this vehicle are in his mother-in-law's name. Id. at Sch. J, Exs. 20-21; Dckt. No. 96, Tr. 168:11-21, 186:15-187:3, 189:2-7, 264:7-10. He claims an equitable interest in the Chevy. Dckt. No. 72, Joint Exs. 17, 20-21; Dckt. No. 96, Tr. 168:11-12, 246:9-17; Dckt. No. 99, Tr. 337:10-340:4, 356:11-357:25. Debtor testified the Chevy is encumbered by a $7,500.00 lien but his mother-in-law declined to provide him with any documentation evidencing the outstanding indebtedness. Dckt. No. 96, Tr. 168:17-170:10, 264:7-13. He also said he was unable to

obtain proof of the indebtedness from the third-party lienholder because he is not the one obligated on the debt.  Id.  During discovery, Sarasota asked Debtor for proof of the indebtedness but never filed a motion to compel. Dckt. No. 99, Tr. 342:20-343:7, 355:1-25.

All of Debtor's family members have cell phones.  Dckt. No. 96, Tr. 245:6-17.  Debtor says they purchased the cell phones for the three children as their only big Christmas presents. Id., Tr. 216:8-13, 244:15-18.  Debtor also owns four firearms—a 9mm, a 22 rifle (more than 22 years old), a 12 gauge, and a 308 rifle.  Dckt. No. 72, Joint Ex. 21.  All of these weapons were ultimately disclosed through a series of amendments to Debtor's Schedule A/B and claimed as exempt.  See Dckt. No. 72, Joint Exs. 17, 20-22.  Debtor also disclosed all of the weapons at his §341 meeting.   Dckt. No. 72, Joint Ex. 19, §341 Mtg. Tr. 8:13-33.   Debtor testified most of his firearms were given as gifts, and he estimated their value based upon visits to pawnshops pricing similar items.  Dckt. No. 96, Tr. 247:16-25.

Sarasota contends Debtor inflated his expenses on Schedule J, and by example states his $1,405.00/month expenses for transportation overstates his actual costs by about $400.00/month.  Id., Tr. 181:1-11, 276:16-25; Dckt. No. 72, Joint Ex. 17, Sch. J.  According to Debtor's bank statement, he paid approximately $1,000.00 for gasoline in the month of September.  Id., Tr. 269:7-275:21; Dckt. No. 72, Joint Ex. 34.  Post-petition Debtor borrowed $5,500.00 from his retirement to repair the Yukon and still has an outstanding balance on this loan.  Dckt. No. 96, Tr. 20:25-21:2, 201:24-202:16, 252:6-12; Dckt. No. 99, Tr. 389:1-3.  In addition, Debtor testified there also are certain medical and personal expenses that were omitted from his Schedules, and that his actual food expense was higher than the $1,000.00 budgeted in his Schedules.  Dckt. No. 96, Tr. 257:25-258:10, 260:18-261:9.

Sarasota also contends many of Debtor's financial problems are the result of poor

AO 72A
(Rev. 8/82)

money management.  In the year prior to his bankruptcy filing, Debtor's bank statements showed close to $1,500.00 in accrued overdraft/return fees. Id., Tr. 258:23-25.  Sarasota says Debtor could avoid these overdraft charges/fees by timing his payments more carefully.  Id., Tr. 14:16-21; Dckt. No. 99, Tr. 368:2-370:11, 397:15-398:9.  Conversely, Debtor said he and his family are on a tight budget, basically living paycheck-to-paycheck, and that there are no lifestyle adjustments he can make to either decrease his expenses or increase his income. Dckt. No. 96, Tr. 252:3-5, 263:17-264:4, 266:6-12.

At the §341 meeting, Debtor said he hoped to pay off the Home Depot debt.  Id., Tr. 172:1-173:5; Dckt. No. 72, Joint Ex. 19, §341 Mtg. Tr. 24:1-25.  Debtor's Schedules list Home Depot as a creditor included in Debtor's bankruptcy.  See Dckt. No. 72, Joint Ex. 17, Sch. D. At trial, Debtor testified he did not intend to pay the debt owed to Home Depot.  Dckt. No. 96, Tr. 197:11-198:3, Dckt. No. 72, Joint Ex. 24.  When questioned by Sarasota about why Debtor's position changed towards repaying Home Depot, Debtor replied "because I ain't got no more money from now to then."  Dckt. No. 96, Tr. 198:2-3.  Since filing his bankruptcy case, Debtor has not made any payments on this debt. Id., Tr. 174:1-10, 249:17-19; see Dckt. No. 72, Joint Ex. 28 (showing the last Home Depot payment was made pre-petition).

The Chapter 7 Trustee appointed to this case filed her Report of Inventory and Abandonment and her Report of No Distribution, stating after " . . . a diligent inquiry into the financial affairs of the [D]ebtor[] and the location of the property belonging to the estate[,] . . . there is no property available for distribution from the estate over and above that exempted by law."  Dckt. No. 28; Dckt. No. 72, Joint Ex. 23.

With this background, Sarasota filed the Dismissal Motion pursuant to §707(a) arguing Debtor has not been forthcoming and has acted in bad faith by filing this bankruptcy to elude

Sarasota's judgment.  Dckt. No. 30.  Sarasota contends Debtor has made no effort to pay any part of its debt while opting to pay his obligations to his other creditors.  Id., Dckt. No. 96, Tr. 166:22-167:1; Dckt. No. 99, Tr. 377:6-8.  Sarasota further states Debtor has failed to adequately disclose his assets and inflated his expenses.  Dckt. No. 30; Dckt. No. 96, Tr. 15:9-16:11; Dckt. No. 99, Tr. 344:10-345:6, 346:5-21, 377:9-379:10.

Debtor filed a Motion to Avoid Sarasota's Judicial Lien.  Dckt. No. 11.  At trial, Debtor argued the non-exempt equity available for Sarasota's judgment lien to attach is $3,648.34 and the remaining portion of the Judgment Amount should be avoided.  Dckt. No. 99, Tr. 341:18-23.  Sarasota argues Debtor's case should be dismissed for bad faith, but if it is not dismissed, Sarasota calculates the available non-exempt equity to be $7,748.34.  Dckt. No. 99, Tr. 350:17-351:7.

## CONCLUSIONS OF LAW

**Motion to Dismiss.**

Section 707(a) provides the court may dismiss a case "for cause."  See 11 U.S.C. §707(a).  "For cause" is not defined, but the Eleventh Circuit has held a debtor's bad faith conduct constitutes cause for dismissal.  Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza), 719 F.3d 1253, 1261 (11th Cir. 2013) ("The Bankruptcy Code does not define 'for cause,' and the three enumerated examples in §707(a) are illustrative, not exhaustive.").  Determinations of "bad faith" are fact-driven analyses, measured by the "totality-of-the-circumstances" of a particular case to assess whether a debtor falls short of the "honest but unfortunate" individual entitled to the fresh start protections afforded by the Bankruptcy Code.  Id. at 1271-72.  The inquiry looks for "atypical conduct" by a debtor which offends the "honest and forthright" spirit of the Bankruptcy Code.  Id.; see Marrama v. Citizens Bank of Mass.,

9

549 U.S. 365, 375 n. 11 (2007).  "There is general consensus that the standard for finding bad faith under §707(a) is stringent, and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence."  In re Chovev, 559 B.R. 339, 345 (Bankr. E.D.N.Y. 2016) (citations, emphasis, and internal quotations omitted); In re Johnson, 2021 WL 3276720, at *5 (Bankr. N.D. Ga. July 30, 2021) (same).  Sarasota bears the burden to establish that cause exists for dismissal of Debtor's case under §707(a).  Piazza, 719 F.3d at 1266.

The parties have agreed the factors set forth in In re Baird, 456 B.R. 112 (M.D. Fla. 2010), while not mandated, are a helpful non-exclusive framework to consider whether Debtor is an honest but unfortunate debtor entitled to the fresh start provided by the Bankruptcy Code. These factors include:

1.  the debtor reduced his creditors to a single creditor shortly before the petition date;
2.  the debtor made no lifestyle adjustments or continued living a lavish lifestyle;
3.  the debtor filed the case in response to a judgment, pending litigation, or collection action;
4.  there is an intent to avoid a large, single debt;
5.  the debtor made no effort to repay his debts;
6.  the unfairness of the use of Chapter 7;
7.  the debtor has sufficient resources to pay his debts;
8.  the debtor is paying debts of insiders;
9.  the schedules inflate expenses to disguise financial well-being;
10. the debtor transferred assets;
11. the debtor is over-utilizing the protections of the Bankruptcy Code to the unconscionable detriment of creditors;
12. the debtor employed a deliberate and persistent pattern of evading a single major creditor;
13. the debtor failed to make candid and full disclosure;
14. the debtor's debts are modest in relation to his assets and income; and
15. there are multiple bankruptcy filings or other procedural "gymnastics."

10

Baird, 456 B.R. at 116-17; Piazza, 719 F.3d at 1272 ("Although we do not adopt the Baird factors, the bankruptcy court did not commit reversible error in its totality-of-the-circumstances analysis.").

Sarasota contends Debtor's actions evidence bad faith, including: (1) his favoring other creditors over Sarasota;  (2) his ability, but refusal to pay all or at least a portion of the debt owed to Sarasota;  (3) his failure to make any lifestyle adjustments;  (4) his failure to communicate, cooperate, and general lack of candor;  (5) his overstatement of his expenses, poor money management, and incomplete disclosure of assets; and (6) his filing bankruptcy in response to Sarasota's collection efforts.  Dckt. No. 30; Dckt. No. 96, Tr. 10:2-20:5; Dckt. No. 99, Tr. 365:8-383:8.  Debtor denies he has acted in bad faith.

Debtor fully acknowledges Sarasota is his primary creditor and its garnishment precipitated his bankruptcy filing.  Dckt. No. 96, Tr. 171:16-19, 237:19-21.  Sarasota argues it is the only real creditor affected by this bankruptcy since Debtor testified at the §341 meeting that he hoped to pay off Home Depot.  Id., Tr. 171:16-173:5; Dckt. No. 30; Dckt. No. 72, Joint Ex. 19, §341 Mtg. Tr. 24:1-25:2.  However, Debtor's initial chapter 7 Schedules list Home Depot as an unsecured debt.  Dckt. No. 72, Joint Ex. 17, Sch. E/F.  This is Debtor's first bankruptcy, and the Court does not find his §341 meeting testimony to be at odds with his Schedules or to support a finding of bad faith.  It is not unusual for debtors to express a desire to pay off creditors when they are able to get back on their feet financially.  See Dckt. No. 72, Joint Ex. 19, §341 Mtg. Tr. 24:1-25 (Debtor stated at his §341 meeting that he was "[j]ust hoping just to get caught up on stuff . . . where we can make the payments on time . . . not having to tell people to wait, getting back on your feet.").  Furthermore, Debtor's counsel clarified at the §341 meeting that the Home Depot debt was included in the bankruptcy.  Id.,

11

§341 Mtg. Tr. 25:1-2.  In addition, there is no evidence Debtor made any payment to Home Depot since filing his case—the $60.00 payment to Home Depot discussed at trial was made by automatic debit before the filing of the bankruptcy petition, not post-petition.  Dckt. No. 96, Tr. 174:1-7, 249:17-25; Dckt. No. 72, Joint Ex. 28.  Having considered the evidence, the Court does not find Debtor has changed his position or any bad faith in regard to this matter,

Sarasota also argued Debtor's credit report shows he paid more than $58,000.00[3] to other creditors during the four years preceding his bankruptcy filing, illustrating Debtor's bad faith treatment towards Sarasota.  Dckt. No. 96, Tr. 216:14-227:3; Dckt. No. 99, Tr. 365:19-367:11, 373:23-374:5; Dckt. No. 72, Joint Ex. 45.

The two largest repayments relate to a $19,000.00 car loan to purchase the 2013 Yukon with more than 200,000 miles that Debtor's wife uses for work and personal matters.  Dckt. No. 96, Tr. 189:14-25, 219:19-221:3; Dckt. No. 72, Joint Exs. 17, 20-21, and 45.  This loan was paid off more than ten months before Sarasota's Collection Letter was sent and over two-and-a-half-years before Debtor filed bankruptcy.  Dckt. No. 72, Joint Exs. 1, 17, 20-21, and 45.

The other large repayment was an approximately $15,000.00 loan Debtor obtained to repair his 2007 Freightliner.  Dckt. No. 72, Joint Ex. 45; Dckt. No. 96, Tr. 221:4-222:10.  Debtor testified he sold this truck and used the proceeds to pay back the loan.  Dckt. No. 96, Tr. 221:4-21.  This loan was repaid more than a year before Sarasota's Collection Letter and

---

[3]  The parties disagree whether Debtor actually paid $58,000.00 during this four-year period.  Debtor's counsel argues Sarasota used the high credit limits rather than the actual amounts Debtor repaid, which Debtor claims to be lower than $58,000.00.  Compare Dckt. No. 99, Tr. 365:19-367:2, 399:20-400:5 (Sarasota's argument), and Dckt. No. 72, Joint Ex. 45 (credit report), with Dckt. No. 99, Tr. 393:22-394:10 (Debtor's argument).  For the purposes of this totality-of-the-circumstances analysis, the exact amount repaid need not be determined.

12

more than three years before Debtor filed this bankruptcy.  Dckt. No. 72, Joint Exs. 1, 17, and 45.

Sarasota acknowledged that many of the remaining repayments within this four-year window may involve a $4,000.00[4] loan being refinanced up to six times with United First Credit Union.  Dckt. No. 72, Joint Ex. 45; Dckt. No. 96, Tr. 221:22-224:14; Dckt. No. 99, Tr. 365:23-366:9.

Overall, apart from the approximately $60.00 pre-petition payment to Home Depot, the last payment shown on Debtor's credit report was made more than six months before Sarasota's Collection Letter and two-and-a-half years before his bankruptcy filing.  Dckt. No. 72, Joint Exs. 1, 2, 28, and 45.  Given the facts of this case, the Court finds no evidence Debtor paid off his other creditors shortly before filing this bankruptcy or the commencement of Sarasota's collection actions in an improper effort to avoid or thwart Sarasota's debt/collection activities or to favor his other creditors over Sarasota.  It is true Debtor made no payments to Sarasota, but he was a guarantor on his father's debt.  He expected his parents to make the Loan payments.  As such, Debtor's failure to pay Sarasota, without more, is not evidence of bad faith.

Sarasota also argued its $38,000.00 debt is significantly less than the $58,000.00 Debtor repaid to his other creditors in the four years preceding his bankruptcy, showing Debtor has the ability to repay all or part of its debt over time.  Dckt. No. 96, Tr. 18:15-19, 19:18-21; Dckt. No. 72, Joint Ex. 45; Dckt. No. 99, Tr. 379:11-380:2.  However, chapter 7 debtors are not required to be destitute in order to survive a §707(a) motion to dismiss.  Chapter 7 is designed to afford debtors the opportunity to tender their non-exempt assets to their creditors

---

[4]  This is an approximation.

13

in exchange for a fresh start.  That is what Debtor has proposed.  "Although bankruptcy courts may not rely <u>solely</u> upon a debtor's ability to pay to the exclusion of all other considerations, a debtor's resources is one relevant indicator, among many, of bad faith or 'cause' to dismiss." <u>Piazza</u>, 719 F.3d at 1274 n. 11 (emphasis in original).  "[A] dismissal based upon a debtor's ability to pay is expressly prohibited by the legislative history of [§]707(a).  In enacting [§]707(a) [unlike §707(b)], Congress unequivocally stated that the Section does not contemplate … that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal."  <u>In re Uche</u>, 555 B.R. 57, 61 (Bankr. M.D. Fla. 2016) (citations and quotations omitted).

Sarasota also contended Debtor inflated his expenses and failed to undertake any cost cutting measures.  Dckt. No. 30; Dckt. No. 96, Tr. 15:9-16:11; Dckt. No. 99, Tr. 367:12-20, 370:12-371:11.  To support its assertion, Sarasota focused upon Debtor's September bank statement to show Debtor overstated his scheduled transportation expenses by approximately $400.00/month.  Dckt. No. 72, Joint Ex. 34; Dckt. No. 96, Tr. 269:7-275:21, 276:16-25.  Bankruptcy Schedule J instructs debtors to "[e]stimate [their monthly] expenses . . . including gas [and] maintenance . . . ."  <u>See</u> Dckt. No. 72, Joint Ex. 17, Sch. J.  Debtor estimated the transportation expenses for his family to be $1,405.00/month, including gas and maintenance.  Dckt. No. 72, Joint Ex. 17, Sch. J, ¶12 and ¶21; Dckt. No. 96, Tr. 180:22-181:11.  All of the charges Sarasota reviewed on Debtor's bank statement were for gasoline and did not include any maintenance or repair charges.  <u>See</u> Dckt. No. 72, Joint Ex. 34.  Merely annualizing the $5,500.00 loan Debtor recently incurred from his retirement savings to repair the Yukon would add another $450.00/month to Debtor's transportation expenses, and this does not account for any general maintenance/upkeep expenses for these vehicles, which are older,

14

high mileage vehicles. Such expenses are inevitable and clearly allowed by Schedule J. The Court does not find Debtor's $1,405.00/month estimate of his transportation expenses to be inflated or indicative of bad faith.

Furthermore, when reviewing his budget, Debtor testified to additional expenses incurred for medication and personal care products/services that were not included in his Schedule J. Dckt. No. 96, Tr. 260:18-261:9. He also stated his food expense listed at $1,000.00/month was a little low. Id. Bankruptcy budgets need to be accurate, but Schedule J is an estimate allowing flexibility for normal everyday life. Dckt. No. 72, Joint Ex. 17, Sch. J; See generally In re Thelen, 431 B.R. 601, 605 (Bankr. E.D.N.C. 2010) ("Schedule J calls for the estimate of the 'average or projected monthly expenses of the debtor and the debtor's family at [the] time [the] case [is] filed[.]'").

Sarasota also reviewed Debtor's utility expenses for mobile phones, a landline phone, internet, and streaming services. Dckt. No. 96, Tr. 207:10-211:8; Dckt. No. 72, Joint Ex. 32. The parties acknowledged that Debtor lives in a rural area and provider/coverage options are limited. Dckt. No. 96, Tr. 259:23-260:17; Dckt. No. 99, Tr. 370:12:18. Debtor's most "extravagant" budget item is $723.00/month for telephone (mobile and landline), internet, satellite, and cable services. Dckt. No. 96, Tr. 180:12-14, 256:13-18; Dckt. No. 72, Joint Ex. 17, Sch. J. Debtor and his wife purchased iPhones for their children and themselves. Dckt. No. 96, Tr. 208:7-14, 214:6-216:13; Dckt. No. 72, Joint Ex. 32. Two of the children are minors and the third child is a 21-year-old college student who returns home on holidays and other occasions. Dckt. No. 96, Tr. 216:8-13, 254:16-22; Dckt. No. 72, Joint Ex. 17, Sch. J. Debtor testified the phones were the only big Christmas gift his children received on those years. Dckt. No. 96, Tr. 216:11-13, 244:15-18. Debtor's Verizon plan covers his entire family

15

and includes monthly charges of $30.00/phone to purchase the phones.  Dckt. No. 72, Joint Ex. 32.  The Debtor will complete each of these contracts shortly and, in theory, would have these funds to pay his creditors.  Id.  iPhones are more luxury-type mobile phones than other brands, and Verizon may be a more expensive provider; however, given the totality-of-the-circumstances of this case, these items are not indicative of a lavish lifestyle or bad faith.  Overall, Debtor's budget is not inflated, lavish, or abusive.

Sarasota also alleged Debtor engaged in a pattern of evasion by not responding to its pre-litigation Collection Letter/phone messages, contesting service, and not attempting to settle or establish a payment plan.  Dckt. No. 30; Dckt. No. 96, Tr. 20:12, 166:22-25; Dckt. No. 99, Tr. 376:14-377:8.  In addition, Sarasota complained Debtor has not been forthcoming in this bankruptcy case and has been slow and difficult in responding to discovery requests. Dckt. No. 96, Tr. 14:22-15:13, 19:12-17.  Debtor stated several times at trial he was unaware he was a defendant to the State Court Action but he does not dispute his liability on the debt or the validity of Sarasota's judgment.[5]  Id., Tr. 146:2-150:18, 153:4-156:10, 159:5-161:15, 239:14-241:7.   It is clear Debtor's father was the primary obligor on the Loan and that Debtor expected his parents to service and take care of this debt.  Although the service issue is troubling, given the totality-of-the-circumstances analysis of §707(a), the Court does not find Debtor's denial of service, his failure to participate/cooperate in the State Court Action/Sarasota's collection actions, or his actions in this bankruptcy to be grounds for dismissal for bad faith.  See In re Mazzella, 2010 WL 5058395, at *6-*8 (Bankr. E.D.N.Y.

---

[5]  Debtor's sworn Petition, Schedules, Lien Avoidance Motion, and Pre-Trial Stipulation do not dispute the validity of Sarasota's judgment against Debtor.  The issue before the Court is whether his denial of service constitutes cause for dismissal under §707(a).

16

Dec. 6, 2010) (Debtor's filing bankruptcy in response to collection actions and his failure to respond to pre-petition subpoenas were not sufficient grounds for a §707(a) dismissal without additional evidence of misconduct.).

As for payments to insiders, the only potential "insider" transaction was the purchase and financing of Debtor's 21-year-old son's iPhone and including the son on the family's Verizon plan. Dckt. No. 96, 208:7-16; Dckt. No. 72, Joint Ex. 32. Debtor's son is a college student whom Debtor claimed as a dependent on his bankruptcy Schedules. Dckt. No. 72, Joint Ex. 17, Sch. J; Dckt. No. 96, Tr. 250:13-25. He acknowledged he will no longer claim this son as a dependent on his tax returns, but the purchase of an iPhone and inclusion of a 21-year-old student on the family phone plan does not constitute bad faith. Id.

There is no evidence of Debtor improperly transferring any assets or ever filing bankruptcy or over-utilizing the bankruptcy system to the detriment of his creditors. Furthermore, given the facts of this case, even though Debtor amended his Schedules multiple times and broadly grouped his assets by generic groupings, these are not uncommon events nor evidence of bad faith or an attempt to hide assets. Similarly, in the proceeding currently before the Court, Sarasota has never filed a motion to compel or a motion for sanctions for any purported discovery abuses and the Court is unaware of any bad faith in this regard.

Although Sarasota may be correct that Debtor's mathematical debt-to-asset ratio is similar to the debtors in In re Piazza, 719 F.3d 1253 (11th Cir. 2013); Walton v. Smith (In re Smith), 229 B.R. 895 (Bankr. S.D. Ga. 1997); and Indus. Ins. Servs. Inc. v. Zick (In re Zick), 931 F.2d 1124 (6th Cir. 1991), these cases are not comparable to the current case. The Piazza, Zick, and Smith debtors clearly had much more lavish lifestyles than Debtor and, more importantly, they each had a litany of other badges of bad faith and egregious conduct not

17

found in this case.

In Piazza, the debtor intentionally tried to evade the reach of a state court judgment for more than two years during which time he transferred significant assets to his wife, paid his great aunt's mortgage, and entered into a lease on a luxury vehicle. Piazza, 719 F.3d at 1260. Debtor and his wife also made significant income. Id. at 1274. It is clear Piazza and his wife had a much more lavish lifestyle than Debtor and equally clear that they improperly tried to divert significant amounts of money away from the judgment creditor in favor of insiders. This is the bad faith, egregious conduct §707(a) was intended to address and such conduct is not present in the current case.

Similarly, in Smith, the court found the debtors had materially underestimated their personal and business income, renewed/entered into leases on luxury vehicles right before filing for bankruptcy when they were already facing severe financial difficulties, and, despite being real estate agents, failed to attempt to sell their home and move into more affordable housing. Smith, 229 B.R. at 896-99. The bankruptcy court found the debtors filed bankruptcy merely as a result of their excesses and failure to make any financial adjustments when they had the ability to do so. Id. Again, clearly bad faith conduct beyond an ability to pay.

Similarly, the debtor in Zick made more than $360,000.00/year from his business without consideration of his wife's income or his real estate holdings. Zick, 931 F.2d at 1128. The bankruptcy was precipitated by a large mediation ruling in favor of Zick's former employer for his malicious breach of a noncompetition agreement. Id. at 1126 n. 1. After considering the facts, the court found Zick transferred assets to insiders shortly before entry of the judgment and improperly manipulated his creditors and assets to avoid one creditor. Id. at 1128-29. Again, Zick was a bad faith debtor attempting to abuse the bankruptcy system.

18

Unlike the debtors in <u>Piazza</u>, <u>Smith</u> and <u>Zick</u>, the Debtor in this case has very little room to make any lifestyle adjustments. While he may be able to budget more efficiently, all of his expenses are reasonable and necessary. Poor money management is not atypical of debtors in bankruptcy, nor is it by itself indicative of bad faith. "[F]iling bankruptcy to protect one's property and obtain a discharge of dischargeable debts is not in and of itself sufficient grounds to justify dismissal of the case." <u>In re Verani</u>, 2015 WL 6146029, at *6 (Bankr. N.D. Ga. Oct. 15, 2015). Debtor does not have the wealth of assets, earning potential, or employment opportunities as these other debtors. More importantly, he has none of the other indicators of bad faith or egregious conduct as found in <u>Piazza</u>, <u>Smith</u>, <u>Zick</u>, or similar cases.

This case is not an abuse or unfair use of chapter 7. Debtor's total assets are about $31,000.00, and his debts exceed $40,000.00. Dckt. No. 72, Joint Exs. 17 and 21; Dckt. No. 99, Tr. 379:23-380:2. The Chapter 7 Trustee abandoned all of Debtor's assets and filed her Report of No Distribution, indicating after "…a diligent inquiry into the financial affairs of the [D]ebtor[] and the location of the property belonging to the estate[,] . . . there is no property available for distribution from the estate over and above that exempted by law." <u>Id.</u>, Joint Ex. 23; Dckt. No. 28. While neither of these factors establish good or bad faith, they do give insight into Debtor's financial position, which also is supported by the totality of the record.

When faced with financial stresses, many debtors assess the benefits and burdens of filing bankruptcy under chapter 7, which often is to the detriment of their creditors. However, filing bankruptcy to avoid paying a debt is not cause for dismissal without other indications of bad faith.

> If filing bankruptcy to avoid the payment of a debt was cause for dismissal, no debtor would ever be able file a bankruptcy case. The purpose of a bankruptcy case is to allow debtors to avoid the payment of debt, preserve the exemptions they

> may have in property, and obtain a fresh start. Preserving property and receiving a discharge of dischargeable debt are valid purposes for filing a bankruptcy case.

In re Verani, 2015 WL 6146029, at *5 (Bankr. N.D. Ga Oct. 15, 2015).

A review of this Debtor's financial situation shows the Judgment Amount is a significant debt for a debtor living close to, or at, his financial means. Dckt. No. 72, Joint Exs. 17, 28, 28B, and 34. Debtor has opted to file chapter 7 bankruptcy where he will pay all of his non-exempt assets over to the creditors in return for a fresh start. This is a cornerstone of the bankruptcy system. The Bankruptcy Code entitles the honest but unfortunate debtor to a fresh start. Grogan v. Garner, 498 U.S. 279, 286-87 (1991). In sum, after considering the totality-of-the-circumstances, the Court does not find bad faith or cause for dismissal of Debtor's case and therefore Sarasota's Dismissal Motion is denied.

**Debtor's Motion to Avoid Sarasota's Judgment Lien.**

In the Lien Avoidance Motion, Debtor concedes that he cannot avoid $3,648.34[6] of Sarasota's judicial lien. Dckt. No. 99, Tr. 341:22-23. Sarasota argues Debtor's case should be dismissed under §707(a) for Debtor's bad faith, but if it is not dismissed, Sarasota contends Debtor may not avoid $7,748.34[7] of its judgment lien. Id., Tr. 342:3-351:7. As explained below, the parties disagree as to whether Debtor has $3,750.00 in non-exempt equity in the Chevy to which Sarasota's judicial lien may attach. They also disagree as to whether Debtor properly claimed a $350.00 exemption in the 9mm and 22 rifle, which will be addressed in

---

[6] This number is comprised of: the non-exempt equity in the Yukon in the amount of $3,426.00 and $222.34 in the various guns. See Dckt. No. 99, Tr. 339:10-341:23.

[7] This number is comprised of: $3,648.34 the parties agree is non-exempt, plus Debtor's $3,750.00 equitable interest in the Chevy, and the $350.00 Sarasota argues is non-exempt equity in the 9mm and 22 rifle discussed in the following section. Dckt. No. 99, Tr. 342:3-351:7.

the following section.

Section 522 of the Bankruptcy Code allows debtors to avoid a judicial lien to the extent it "impairs" a debtor's ability to exempt certain property. See 11 U.S.C. §522(f)(1). Section 522(f)(2)(A) sets forth the mathematical formula for determining if a judicial lien impairs a debtor's exemptions. A lien "impairs" a debtor's exemption to the extent that "the sum of—

      (i) the lien;
      (ii) all other liens on the property; and
      (iii) the amount of the exemption that the debtor could claim
      if there were no liens on the property;

exceeds the value that the debtor's interest in the property would have in the absence of any liens." 11 U.S.C. §522(f)(2)(A). A debtor seeking to avoid a lien under §522(f) bears the burden of proving impairment by a preponderance of the evidence. In re Sutter, 2021 WL 811584, at *2 (Bankr. N.D. Ohio Feb. 25, 2021); In re Waters, 1993 WL 13004587, at *2 (Bankr. S.D. Ga. Jan. 26, 1993).

Here, Debtor valued his interest in the Chevy at $5,000.00 and claimed a $1,250.00 exemption in the Chevy under O.C.G.A. § 44-13-100(a)(6). Dckt. No. 72, Joint Exs. 17, 20-22. Absent any other liens on the vehicle, there would be $3,750.00 in non-exempt equity to which the judicial lien could attach. Debtor, however, asserts the Chevy is subject to a $7,500.00 lien. In that case, there would be no non-exempt equity to which the judicial lien could attach.

Sarasota does not oppose Debtor's claimed $1,250.00 exemption in the Chevy (the §522(f)(2)(A)(iii) component of the formula). Instead, Sarasota argues Debtor has failed to carry his burden of establishing the amount of the alleged $7,500.00 "other lien" on the Chevy (the §522(f)(2)(A)(ii) component of the formula). The Court agrees with Sarasota. Debtor testified that the outstanding amount owed on this vehicle is $7,500.00 but failed to provide

any supporting documentation other than his own Schedules.  Based upon the facts of this case, the Court finds Debtor has failed to carry his burden of establishing the amount of the "other liens" on the Chevy. Therefore, Debtor cannot avoid an additional $3,750.00 of Sarasota's judicial lien.  Accordingly, Debtor's Motion to Avoid Sarasota's judgment lien is denied as to $7,398.34 of Sarasota's judgment lien, comprised of: $3,648.34 the parties agree is non-exempt, plus Debtor's $3,750.00 equitable interest in the Chevy.[8]  Dckt. No. 99, Tr. 342:3-351:7.

**Sarasota's Objection to Debtor's Claim of Exemptions.**

Sarasota also objects to Debtor's O.C.G.A. §44-13-100(a)(4) claim of exemptions on two guns[9] as "household goods," namely the 9mm and the 22 rifle.

The Bankruptcy Code allows debtors to exempt certain assets from the reach of their creditors as part of their fresh start.  In re VanWinkle, 2017 WL 4457413, at *2 (Bankr. E.D. Ky. Oct. 4, 2017) (citations omitted) ("[A] debtor is entitled to exempt certain property from the bankruptcy estate.  Exempt property is carved out of the bankruptcy estate to ensure the debtor has the 'basic necessities of life so that he will not be left entirely destitute by his creditors.'").  Pursuant to §522(b)(2) Georgia has "opted out" of the federal Bankruptcy Code exemptions, allowing Georgia debtors to take the state law exemptions set forth in O.C.G.A. §44-13-100 et seq.  See generally, In re McFarland, 790 F.3d 1182, 1185 (11th Cir. 2015).

Georgia's exemption statute does not specifically address firearms.  To the extent

---

[8]  This Order does not address what the surviving judicial lien attaches to post discharge.

[9]  At trial, Debtor's counsel clarified that Debtor's O.C.G.A. §44-13-100(a)(4) household exemption claim for firearms was for the 9mm ($200.00) and 22 rifle ($150.00).  Dckt. No. 99, Tr. 346:22-347:14, 351:16-20.

AO 72A
(Rev. 8/82)

firearms are expressly exemptible in Georgia, some debtors employ O.C.G.A. §44-13-100(a)(4),[10] which allows a debtor to exempt an interest "not to exceed $300.00 in value in any particular item, in household furnishings, <u>household goods</u>, wearing apparel, appliances, books, animals, crops, or musical instruments that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor . . . ." O.C.G.A. §44-13-100(a)(4) (emphasis added).

Sarasota argues the definition of household goods is "those items of personal property that are typically found in or around the home <u>and</u> used by the debtor or his dependents to support and facilitate day-to-day living within the home, including maintenance and upkeep of the home itself." <u>In re Raines</u>, 161 B.R. 548, 550 (Bankr. N.D. Ga. 1993) <u>aff'd</u>, 170 B.R. 187, 188 (N.D. Ga. 1994) (citations and emphasis added).  The court in <u>Raines</u> found there must be a "functional nexus" between the good <u>and</u> the household.  <u>Raines</u>, 161 B.R. at 550 <u>aff'd</u>, 170 B.R. at 188.  Similarly, Judge Dalis has defined household goods as "items of tangible personal property held primarily for personal or family use by the debtor or a dependent . . . in or about the household, excepted therefrom items held for investment purposes or items having a pecuniary value independent of their functional use."  <u>In re Plummer</u>, 1988 WL 1019659, at *7 (Bankr. S.D. Ga. July 1, 1988).

Sarasota contends Debtor's testimony at trial indicated the weapons were used for hunting and failed to establish a functional nexus between that use and the household.  Dckt. No. 99, Tr. 347:10-15, 354:1-8.  After considering the evidence, the Court disagrees.  At trial,

---

[10]  While not at issue in the current matter, in addition to the "household goods" argument, Georgia debtors also may use their wildcard exemption for weapons.  <u>See</u> O.C.G.A. 44-13-100(a)(6).  In fact, Debtor has used part of his wildcard exemption in this case to exempt his other weapons.

23

Debtor acknowledged he owned the firearms, but he was not asked to explain how he uses them, nor did he limit their usage to hunting and/or recreation. Dckt. No. 96, Tr. 187:7-12, 194:15-25, 195:1-9, 242:23-25, 243:4-8, 247:16-25, 248:11-25, 249:1-4. The "hunting" reference arose in the testimony regarding Debtor's "household goods" on Schedule A/B, which lists "hunting supplies," and where he acknowledged his wife hunts too. See Dckt. No. 96, Tr. 245:23-248:18; Dckt. No. 72, Joint Ex. 21, Sch. A/B at ¶9. The firearms are listed as household items under the separate "firearms" category. Dckt. No. 72, Joint Ex. 21, Sch. A/B at ¶10.

Consistent with bankruptcy's "fresh start" principle, a debtor's claimed exemptions are presumptively valid. Wasden v. Nationwide Mut. Ins. Co. (In re Weaver), No. 04-40409, AP No. 04-4118, 2007 WL 7022205, at *2 (Bankr. S.D. Ga. July 25, 2006); see also 11 U.S.C. §522(l). As Sarasota acknowledged, pursuant to Bankruptcy Rule 4003(c), it "…has the burden of proving that the exemptions are not properly claimed." See Fed. R. Bankr. P. 4003(c); Dckt. No. 99, Tr. 349:16-350:1-11; In re Miles, 1992 WL 12004377, at *2 (Bankr. S.D. Ga. Dec. 5, 1992). The Court finds that Sarasota failed to carry its burden of rebutting Debtor's presumptively valid claim of exemptions in these two firearms. Weaver, 2007 WL 7022205, at *3.

As previously stated, Debtor lives in rural Eastman, Georgia. In such communities it is common for families to own weapons for protection and animal control. See also In re Heath, 318 B.R. 115, 118 (Bankr. W.D. Ky. 2004) ("[T]he cultural and, more specifically, the geographic environment of the [d]ebtors is of particular importance in this case."); Plummer, 1988 WL 1019659, at *6 (considering firearm usages in rural areas).

It is clear from Debtor's testimony that he considered the firearms to be household

24

goods. Debtor's 9mm is the type of firearm commonly used for defense and protection of the home. As Judge Drake noted in In re Raines:

> . . . a .357 Smith & Wesson Magnum handgun . . . [l]ike the revolver [is the] type of firearm typically [] used for defense purposes and protection in and around the home. . . . This [c]ourt is of the opinion that such an item satisfies the . . . definition of "household goods" in that items commonly used to protect the home and its occupants support and facilitate daily household living. . . . [T]here exists a sufficiently strong "functional nexus" between the handgun as a good and the [d]ebtors' household. Therefore, the [c]ourt finds that the [d]ebtors' handgun is a "household good" [and allows the exemption].

Raines, 161 B.R. at 551.

Similarly, given Debtor's cultural environment and rural location, it is common for a small caliber weapon such as the 22 rifle to be around the homeplace and used for protection and animal control. "A firearm may be maintained for the protection of the debtor, debtor's dependents, and property. In a rural agricultural setting, a firearm used in animal control may be vital in the protection of the debtor's property and livelihood. There can be no presumption that a firearm is maintained by a debtor solely for recreational uses." Plummer, 1988 WL 1019659 at *6.

In conclusion, the Court finds Sarasota has failed to carry its burden to show these weapons are not household goods. Furthermore, given Debtor's geographic location and cultural considerations, the Court finds a functional nexus between Debtor's 9mm and his 22 rifle and the protection, maintenance, and upkeep of his homeplace and family. Therefore, Sarasota's objections to Debtor's O.C.G.A §44-13-100(a)(4) exemption claims on the 9mm ($200.00) and the 22 rifle ($150.00) are denied.

**Pre-Trial Rulings on Admissibility of Exhibits.**

At the Pre-Trial Conference, the Court orally ruled on the parties' outstanding objections/responses to proposed trial exhibits and this section memorializes those rulings. Dckt. No. 82.  For the reasons set forth on the record at the Pre-Trial Conference and those set forth below the Court enters the following rulings:

**Sarasota's Objections.**

Sarasota objected to the admissibility of two of Debtor's exhibits: (1) Debtor's non-filing spouse's pay advices (D-3); and (2) Debtor's July 2022 power bill (D-14).  Dckt. No. 75.  At the Pre-Trial Conference, Sarasota withdrew its objection to the power bill exhibit.  As to the admissibility of Debtor's non-filing spouse's pay advices, Sarasota's objection was based on:  Debtor having no personal knowledge; an inability to authenticate; and hearsay. Id.  The Court overruled Sarasota's objection, finding the pay advices were not being used for the truth of the matter asserted, but rather as support for Debtor's Schedule I and his budget, which required Debtor to include the non-filing spouse's income.  See Dckt. No. 72, Joint Ex. 17, Sch. I ("If you are married and not filing jointly, and your spouse is living with you, include information about your spouse.").  In addition, Debtor and his wife share a joint checking account and Debtor has sufficient knowledge of his non-filing spouse's income by virtue of the paychecks being deposited into this account.  See Dckt. No. 72, Joint Ex. 28B. Furthermore, these joint bank account records have been admitted into evidence so corresponding deposits may be reviewed.  Id.  For these reasons, the objection is overruled, subject to foundation objections raised at trial.

**Debtor's Objections.**

Debtor objected on hearsay grounds to four of Sarasota's proposed exhibits: (1) TV

AO 72A
(Rev. 8/82)

Providers in Eastman, Georgia (S-1); (2) Internet Providers in Eastman, Georgia (S-2); (3) TV/Internet Providers in Eastman, Georgia (S-3); and (4) Kelley Blue Book on the Average New Car Price. Dckt. No. 73. The Court overruled Debtor's objections as to S-1 through S-3 stating the Court would take judicial notice of the availability of such utility providers in the area pursuant to Federal Rule of Evidence 201; however, these exhibits alone could not be used for the truth of the availability/pricing of such services to this particular Debtor.

The Court also overruled Debtor's hearsay objection to the Kelley Blue Book exhibit finding it falls within the hearsay exception for market reports and similar commercial publications. See Fed. R. Evid. 803(17). Courts frequently rely on Kelley Blue Book type publications under this hearsay exception. See In re McElroy, 339 B.R. 185 (Bankr. C.D. Ill. 2006) (allowing N.A.D.A. data to be used in valuing debtor's vehicle); In re Best, 2018 WL 6060316 (Bankr. N.D. Ga. Nov. 19, 2018) (noting guides such as N.A.D.A. and Kelley Blue Book are reliable sources for valuation); Hon. Barry Russell, Bankruptcy Evidence Manual, §803:30 (2022 ed.) (same). The Court reserved ruling on relevancy until trial. Ultimately, Sarasota withdrew this exhibit from the record at trial. See Dckt. No. 96, Tr. 299:4-10.

**Conclusions.**

For these reasons, it is ORDERED:

(1) Sarasota's §707(a) Motion to Dismiss is DENIED;

(2) Debtor's Motion to Avoid Sarasota's Judicial Lien is DENIED as to $7,398.34 of Sarasota's judgment lien and GRANTED as to the remaining portion;[11]

(3) Sarasota's objection to Debtor's O.C.G.A. §44-13-100(a)(4) claim of exemption for the 9mm in the amount of $200.00 is DENIED;

---

[11] See fn. 8, supra.

(4) Sarasota's objection to Debtor's O.C.G.A. §44-13-100(a)(4) claim of exemption for the 22 rifle in the amount of $150.00 is DENIED;

(5) Sarasota's objection to the admissibility of the Debtor's non-debtor spouse's pay advices is OVERRULED, subject to foundation objections raised at trial;

(6) Debtor's objections to the admissibility of Sarasota's TV, Internet, and bundled service provider exhibits are OVERRULED; and

(7) Debtor's objection to the admissibility of Kelley Blue Book data is OVERRULED, subject to relevancy objections raised at trial.

**[END OF DOCUMENT]**

AO 72A
(Rev. 8/82)